RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0295p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

A.O. SMITH CORPORATION, GAYLORD ENTERTAINMENT COMPANY, OPRYLAND HOTEL NASHVILLE, LLC, GRAND OLE OPRY, LLC, GAYLORD PROGRAM SERVICES, INC., OPRYLAND ATTRACTIONS, LLC, WILDHORSE SALOON ENTERTAINMENT VENTURES, INC., OLH, G.P., GAYLORD HOTELS, INC. (13-5578); CONTINENTAL INSURANCE COMPANY, GIBSON GUITAR CORP., HARRIS CORPORATION, OSG SHIP MANAGEMENT, INC., CARTERS INC., L-3 COMMUNICATIONS HOLDINGS INC., QINETIQ NORTH AMERICA OPERATIONS LLC, ABC BUS COMPANIES INC., INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, TOKIO MARINE & NICHIDO FIRE INSURANCE CO., LTD. (US BRANCH), NISSAN NORTH AMERICA, INC., METAL ONE HOLDINGS AMERICA, INC., FIREMAN'S FUND INSURANCE COMPANY (13-5599),

                     *Plaintiffs-Appellants*,

    *v.*

UNITED STATES OF AMERICA,

                     *Defendant-Appellee*.

Nos. 13-5578/5599

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
Nos. 3:12-cv-00429; 3:12-cv-00433—Todd J. Campbell, District Judge.

Argued: March 20, 2014

Decided and Filed: December 18, 2014

Before: BATCHELDER and McKEAGUE, Circuit Judges; OLIVER, District Judge[*]

---

[*]The Honorable Solomon Oliver, Jr., Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

---

**COUNSEL**

**ARGUED:** Patricia Head Moskal, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellants in 13-5578. Anthony J. Pruzinsky, HILL RIVKINS LLP, New York, New York, for Appellants in 13-5599. Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Patricia Head Moskal, Robert S. Patterson, Edmund S. Sauer, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellants in 13-5578. Keith B. Dalen, Lauren E. Komsa, HILL RIVKINS LLP, New York, New York, for Appellants in 13-5599. Alisa B. Klein, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   Appellants in these consolidated cases contend that the Army Corps of Engineers ("Corps") negligently failed to follow its flood protocols in operating Old Hickory Dam, exacerbating the property damage caused by a one-thousand-year flood event in Tennessee. The district court dismissed Appellants' claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), holding that Appellants' claims were barred by the immunity provided in the Flood Control Act, 33 U.S.C. § 702c, and by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a). We AFFIRM because the discretionary function exception bars Appellants' claims.

**I.**

The Cumberland River flows through Kentucky and Tennessee. The river contains ten dams, one of which is Old Hickory Dam. Old Hickory was built to promote navigation and electricity. Water that flows through Old Hickory eventually reaches Nashville, which sits in the bottom of the Central Basin of the Cumberland River.

The reservoir behind Old Hickory can store a significant amount of water, and conceptually is divided vertically into three pools. The inactive pool occupies the area from the

bottom of the reservoir up to 442 feet above sea level. The power pool occupies the area from 442 feet to 445 feet. And the surcharge pool occupies the area from 445 feet to 450 feet. If water exceeds the capacity of the surcharge pool, the dam is in danger of being overtopped and damaged. The Corps then must accelerate discharges through the dam to prevent it from being destroyed.

The water level in Old Hickory's reservoir is generally maintained in the power pool. Old Hickory's Water Control Manual ("Water Control Manual") states that "to enhance recreational opportunities, it is desirable to maintain Old Hickory in the upper one foot of the power pool, between elevations 444 and 445." The surcharge pool is kept empty: "Water is permitted in the flood surcharge pool only during flood events." Surcharge storage is intended only to "replace the natural valley storage lost due to the impoundment of a reservoir." In other words,

> The loss of valley storage can send flood waters into a reach of river quicker than would be the case under natural conditions and subsequently cause stages at downstream points to be higher than would be the case had the project not been built. These increases in flood depths would be relatively minor, but even minor increases in flood depths cause an increase in damage. To prevent the Old Hickory reservoir from causing such an increase in downstream flood depths, the flood surcharge storage space is used to store this excess water and thus return downstream flood stages to those that would have existed had Old Hickory Dam never been built. Thus, no overall improvement in downstream flood stage conditions are [sic] expected from the flood surcharge storage at Old Hickory.

The "Flood Regulation" portion of the Water Control Manual outlines management protocols to execute depending on existing or anticipated flood conditions. Although the Water Control Manual does not provide a trigger for these protocols, it juxtaposes "Flood Regulation" with "Normal Regulation." The Master Water Control Plan for the Cumberland River Basin ("Master Plan") states that "[r]eal time reservoir management requires a great deal of judgement [sic] in operation. It is recognized that the demands of water resource management are at times conflicting and the water control manager must have some degree of operation flexibility." There are multiple Corps' directives relevant to this case, including the aforementioned Water Control Manual and Master Plan, as well as the Old Hickory Dam Instructions for Reservoir Regulation Manual ("Reservoir Regulation Manual") and general Corps Engineering Regulations.

First, the Water Control Manual states that

preflood drawdown to elevation 442 is permitted upon direction from the Water Management Section.  Since the pool typically remains in the upper one foot of the three foot power pool, as desired for recreation, it is doubtful that there will be sufficient time for the full pool to be emptied by preflood drawdown. . . . A maximum rate of rise of one foot per hour at Nashville is used to guide preflood drawdown operations.

Second, the Water Control Manual advises that "releases greater than 'natural' flows should be made at the onset of a flood to conserve storage for the peak."  But this directive is "[s]ubject to the 5,000 cfs [cubic feet per second] per hour increase limitation" for combined flows from Old Hickory and the nearby J. Percy Priest Dam outlined in the Reservoir Regulation Manual.

Third, the Reservoir Regulation Manual states that Corps policy is to "conserv[e] all surcharge storage" and any storage that could be gained through pre-flood drawdown of the power pool "until it is clearly evident that the storm has passed."  As the Water Control Manual puts it, "Flood storage is best used just prior to the peak of the flood to maximize reduction of the peak outflow from the project."  According to the Reservoir Regulation Manual, the "one exception to the policy of conserving all surcharge storage" is "[i]f the rise is expected to be short term, and the reservoir level is projected to not exceed elevation 445.15 . . . ."

And fourth, the Water Control Manual provides that

[i]f the control flow at Nashville cannot be maintained while holding the water surface within the power pool, then flood surcharge storage is utilized.  If the headwater is rising faster than 0.15 feet per hour, Old Hickory releases are increased and the Nashville control flow is exceeded, but the increase in maximum combined spillway releases from Old Hickory and J. Percy Priest is limited to 5,000 cfs per hour.  This operating constraint remains in effect until all surcharge storage is used, at which time the discharge is increased as necessary to maintain the water surface at the top of the flood surcharge pool, elevation 450.

The "Flood Periods" provisions of the Reservoir Regulation Manual offer an additional consideration:  "If maximum flows at Nashville cannot be maintained while holding water surface within the power pool, set the surcharge pool fill rate at or below 0.15 feet per hour, subject to the 5,000 cfs per hour increase limitation stated below."

* * *

An unprecedented storm swept through the Cumberland River Basin on May 1–2, 2010. A smaller storm that occurred one week earlier had already saturated the ground. On April 28, the National Weather Service ("NWS") predicted rainfall of up to 6.2 inches for the area, a projection that was increased to 7.8 inches by April 30. Water was kept at its usual depth during this time—six inches from the top of the power pool—even though the Corps was aware of the storm forecast. The rain began to fall in the early morning on May 1, and the NWS increased its regional rainfall projection to 8.6 inches.

The Corps did not increase discharges through the dam until the Corps' Nashville District Commander declared a flood emergency at 1:00 p.m. on May 1. According to Appellants, "the releases were still *less* than the natural flows from the rainfall and the stormwater runoff draining into Old Hickory Reservoir . . . ." Appellants' Br. 15. Forty minutes after the emergency was declared, the Corps' Nashville District Water Manager left his office and did not return until that evening at 7:00 p.m. During his absence, water levels in the Old Hickory Reservoir rose by over one foot and well into the surcharge pool. The Water Manager then left his office again at 11:00 p.m., not returning until Sunday morning, May 2.

By Sunday morning at 6:00 a.m., before the second round of storms arrived, the water level had reached 447.75 feet. Over half of the capacity of the surcharge pool had been used before any rain had fallen from the second round of storms. By 12:00 p.m. on May 2, the water level had risen to the top of the surcharge pool and the Corps was forced to release massive volumes of water through the Dam. By 6:00 p.m., the Dam was discharging water at the rate of 212,260 cfs. The Corps never warned downstream residents that it was discharging such an unprecedented amount of water into the Cumberland River. The discharged waters eventually reached the Nashville area, breaching levees and destroying and damaging Appellants' property.

The district court held that the immunity provided to the United States by the Flood Control Act bars Appellants' claims because "[l]ooking at the character of the waters, as alleged in Plaintiffs' Complaint, and following the guidance set forth in *Central Green* . . . Plaintiffs' injury was caused by 'floods or flood waters at any place.'" Dist. Ct. Op. 8 (citing 33 U.S.C. § 702c). As an alternative basis for dismissal, the court held that the discretionary function

exception to the FTCA bars Appellants' claims. The district court held that that exception applies when government employees act pursuant to "general directives as to the goals to be achieved, and employees maintain discretion as to how and when these directives are to be implemented" while "consider[ing] multiple policy objectives in determining how and when to implement the general directives." *Ibid.*

## II.

We review de novo the district court's dismissal based on the discretionary function exception to the FTCA. *Kohl v. United States*, 699 F.3d 935, 939 (6th Cir. 2012). The discretionary function exception shields the government from liability for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The government retains its immunity when the challenged conduct satisfies both parts of a two-part test. First, the conduct must be "discretionary," not "controlled by mandatory statutes or regulations." *United States v. Gaubert*, 499 U.S. 315, 328 (1991). Put differently, the action in question must "involve[] an element of judgment or choice," rather than follow a "federal statute, regulation, or policy specifically prescrib[ing] a course of action" and leaving "the employee [] no rightful option but to adhere to the directive."[1] *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, the exercise of discretion must be "the kind that the discretionary function exception was designed to shield;" *id.*, *i.e.*, it must be "susceptible to policy analysis," *Gaubert*, 499 U.S. at 325. There is a "strong presumption" that the second part of this *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion. *Id.* at 324. We examine each of Appellants' challenges using this framework.

---

[1]These "directive[s]" may come from published regulations or even internal agency documents. *See Gaubert*, 499 U.S. at 324.

**A.**

Appellants argue that the Corps negligently failed to initiate drawdowns of Old Hickory's reservoir prior to the storm. The Corps did, however, lower the water level in the power pool by six inches on April 29, prior to the storm's arrival. Regardless, the Corps' manuals and regulations do not mandate pre-flood drawdown and the Corps' decision was susceptible to policy analysis.

The Water Control Manual warns that "[p]reflood drawdown capability is limited by the quick response of the Cumberland Basin. There is often only hours between a rainfall event and the increase in project inflows. However, preflood drawdown to elevation 442 is permitted upon direction from the Water Management Section." It also says that "surcharge storage and any additional storage that can be gained by preflood drawdown should be preserved until it is clearly evident that the storm has passed." The fact that pre-flood drawdown "is permitted" and "should be" utilized in some situations does not mean that the Corps *must* engage in pre-flood drawdown.

In *Montez ex rel. Estate of Hearlson v. United States*, 359 F.3d 392 (6th Cir. 2004), we held that the language requiring the Bureau of Prisons to "provide for the protection" and "provide for the safekeeping" of inmates was "of a general nature," *id.* at 396, as were regulations that said an inmate "may" be removed from the general prison population for safety reasons, *id.* at 397. These regulations "allowed [Bureau of Prison] officials to exercise judgment when making decisions . . . ." *Ibid.* As the quoted language from the Water Control Manual illustrates, the Water Control Manual also uses general, permissive language in describing its pre-flood protocols.

The relationship among Old Hickory and other nearby dams bolsters this conclusion. The Corps, according to the Water Control Manual, is required to coordinate Old Hickory's releases with releases from J. Percy Priest in order "to limit the increase in combined release[s] to 5,000 cfs per hour . . . ." Discharges from J. Percy Priest Dam, Old Hickory Dam, and the 275 square mile drainage area "must be considered when developing an operating plan to achieve a desired flow or a rate of change in flow at Nashville." And drawdowns cannot exceed "[a] maximum rate of rise of one foot per hour at Nashville." Thus, even if pre-flood drawdowns

were mandatory, the Corps was required to consider a plethora of factors prior to initiating them. As the Master Plan admits, these constraints create "demands" that "are at times conflicting and the water control manager must have some degree of operational flexibility."

In *Myers v. United States*, 17 F.3d 890, 895 (6th Cir. 1994), we held that the protocols to be followed by Mine Safety and Health Administration inspectors were "replete with choice." All the directives used an "if/then" framework that required the inspectors to make a particular assessment prior to acting. Although the course of action "must" follow, the decision whether the antecedent condition exists afforded sufficient discretion to satisfy the first prong of the *Gaubert* test. *Id.* at 896. In this case, the Corps must follow conflicting directives whose applicability requires assessing dynamic environmental conditions. And the Corps must exercise "judgment or choice" in assessing these antecedent conditions. *See Gaubert*, 499 U.S. at 322 (citing *Berkovitz*, 486 U.S. at 536).

Furthermore, under the second part of the *Gaubert* test, the Corps' decision was susceptible to policy analysis. The Water Control Manual articulates three "primary objectives" for the dam: "commercial navigation," "hydropower," and replacement of the natural valley storage. The Water Control Manual even states that "to enhance recreational opportunities, it is desirable to maintain Old Hickory in the upper one foot of the power pool," the level at which the power pool was being kept by the Corps prior to the flood event. Appellants concede that the water level was kept six inches from the top of the power pool in order to facilitate navigation, Appellants' Br. 38, a relevant public policy consideration. For Appellants to prevail they must argue that the Corps is required to ignore other policy considerations in the face of an oncoming storm. Nothing in the applicable manuals suggests this is so.

Appellants argue that the Corps' "conduct only involves objective hydrological and mathematical calculations," which are not susceptible to policy analysis. Appellants' Br. 58. In *Myers*, 17 F.3d at 895, we asked whether Mine Safety and Health Administration inspectors were authorized to make safety considerations on the basis of public policy. We held that the policy balancing had been done by others, and that the inspectors "are *not authorized* to reweigh these interests on a case-by-case basis. Rather, they are to determine compliance and, in the

event of non-compliance, issue the mandatory citations and orders." *Id.* at 898.[2] But deciding whether to initiate pre-flood drawdowns requires more than the ministerial application of objective principles, as was the case in *Myers*. The Supreme Court rejected this line of reasoning in *Gaubert* itself. There, shareholders argued that actions taken by federal regulators "involved the mere application of technical skills and business expertise." *Gaubert*, 499 U.S. at 331. The Court held that decisions such as replacing corporate management, intervening with state agencies, and initiating bankruptcy actions for insolvent subsidiaries, *see id.* at 332–33, "involved the exercise of choice and judgment," *id.* at 331. The Court suggested that only a narrow class of regulatory actions involve no choice or judgment: "It may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations, but the regulatory acts alleged here are not of that genre." *Id.* The Corps' actions in this case are not of that genre either. The Corps was required to exercise its discretion in balancing competing and conflicting directives and policy goals, decisions at the very heart of the discretionary function exception. The district court did not err by dismissing Appellants' pre-flood drawdown claim.

## B.

Appellants argue next that the Corps was required to discharge water at greater than natural flows at the beginning of the storm in order to conserve storage capacity. Appellants' Br. 45. The Water Control Manual states that "releases greater than 'natural' flows should be made at the onset of a flood to conserve storage for the peak." Appellants argue that the Corps only made releases greater than natural flows after Old Hickory was in danger of being overtopped. Appellants' Br. 46. But again, the language in which the Water Control Manual gives the appropriate response to dynamic conditions is less than mandatory: releases "should be made." Furthermore, the Water Control Manual says that releases greater than natural flows are subject to other constraints, including a rate-of-rise ceiling at Nashville: "A maximum rate of rise of one foot per hour at Nashville is used to guide preflood drawdown operations." It is also conceivable that discharges from J. Percy Priest in combination with storm water runoff might, on their own,

---

[2] Appellants also cite *Reminga v. United States*, 631 F.2d 449 (6th Cir. 1980), in support of their distinction. *Reminga*'s analysis, however, we predicated on the operational level/planning level framework rejected by *Gaubert*. *See id.* at 456; *see also Gaubert*, 499 U.S. at 326.

exceed the rate-of-rise ceiling, preventing Old Hickory from discharging at greater than natural flows anyway.  In fact, this appears to be what happened.  *See* U.S. Army Corps of Engineers, *May 2010 Flood Event Cumberland River Basin After Action Report* at Page 51–52 ("By limiting the Old Hickory release to 75,000 cfs, an additional 15,000 cfs of channel capacity at Nashville was reserved for releases from the J. Percy Priest project and the uncontrolled area between Old Hickory and Nashville.").  The operational flexibility needed to assess these factors demonstrates that the Corps has discretion.  The second prong of the *Gaubert* test also is satisfied because, as noted above, the Water Control Manual contemplates that the Corps will balance flood prevention with other legitimate policy goals, including power generation, navigation, and downstream conditions.  Thus, the district court did not err by dismissing this claim.

## C.

Appellants argue that the Corps ignored the "critical and unequivocal" requirement that it preserve Old Hickory's surcharge storage pool until after the storm had passed.  Appellants' Br. 46.  The district court concluded that even if the Corps was required to preserve Old Hickory's surcharge storage, the Corps "is not directed specifically *how and when* to perform the various tasks."  Dist. Ct. Op. 8.  Although we affirm the district court's dismissal of this claim, we do not adopt this reasoning.  Corps protocols may fail to specify *how* and *when* they are to be implemented, but the protocols may nonetheless be nondiscretionary as to *whether* they are to be implemented.  *See Navarette v. United States*, 500 F.3d 914, 918 (9th Cir. 2007) ("[T]he Army Corps certainly retained discretion as to *how* to mark or fence drop-offs, but that does not mean it retained discretion *whether* to do so.").

The Water Control Manual provides that "[w]ater is permitted in the flood surcharge pool only during flood events."  In addition,

> [f]lood surcharge storage is best used just prior to the peak of the flood to maximize reduction of the peak outflow from the project. . . . If the surcharge storage is used too soon, there could be no storage space remaining when the peak arrives.
>
> . . . .
>
> Thus, the surcharge storage and any additional storage that can be gained by preflood drawdown should be preserved until it is clearly evident that the storm has passed.

. . . .

There is one exception to the policy of conserving all surcharge storage where it is advisable to allow the reservoir to rise above the top of the power pool prior to the spill. If the rise is expected to be short term, and the reservoir level is projected to not exceed elevation 445.15, then spillway releases are not required.

. . . .

If the control flow at Nashville cannot be maintained while holding the water surface within the power pool, then flood surcharge storage is utilized. If the headwater is rising faster than 0.15 feet per hour, Old Hickory releases are increased and the Nashville control flow is exceeded, but the increase in maximum combined spillway releases from Old Hickory and J. Percy Priest is limited to 5,000 cfs per hour. This operating constraint remains in effect until all surcharge storage is used, at which time the discharge is increased as necessary to maintain the water surface at the top of the flood surcharge pool, elevation 450.

The Corps retains discretion as to whether to keep the surcharge pool empty. The Water Control Manual uses aspirational, goal-oriented language in describing the Corps' management of Old Hickory's surcharge storage. The Water Control Manual says, "Flood surcharge storage is best used just prior to the peak of the flood . . . . Thus, the surcharge storage and any additional storage that can be gained by preflood drawdown should be preserved until it is clearly evident that the storm has passed." We cannot conclude that this language leaves the Corps with no choice but to adhere to the protocol. *See Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997) ("The relevant inquiry is whether the controlling statutes, regulations and administrative policies mandated that the Forest Service maintain its campsites and fire pits in any *specific* manner. If not, the Forest Service's decisions as to the *precise manner* in which to do so would clearly fall within the discretionary function exemption to the government's tort liability." (citation omitted)).

Appellants rely on language in two of the manual provisions quoted above. First, Appellants argue that the "one exception to the policy" language means that the policy is mandatory. The Corps, however, contemplates more than "one exception" to this policy because the last paragraph quoted above requires using the flood surcharge storage "[i]f the control flow at Nashville cannot be maintained while holding the water surface within the power pool" even if this occurs before it is "clearly evident that the storm has passed." The Corps is again faced with

conflicting demands, all of which cannot be simultaneously mandatory. Given this scheme, we must afford, as the Master Plan puts it, a "degree of operational flexibility" to the Corps.

Second, Appellants point to the Corps' description of the surcharge conservation policy as an "operating constraint." Appellants' Br. 46. Appellants misread this portion of the Water Control Manual. The "operating constraint" referred to by the Corps is not the policy of conserving the surcharge pool, but is instead the policy of *using* the surcharge pool when "control flow at Nashville cannot be maintained" and "headwater is rising faster than 0.15 feet per hour." Thus the operating constraint requires the *use* of surcharge storage in some instances; it does not require its nonuse. Appellants are correct that the Reservoir Regulation Manual instructs that the Corps should "set the surcharge pool fill rate at or below 0.15 feet per hour," but this requirement is itself subject to a 5,000 cfs per hour increase in combined discharges from Old Hickory and J. Percy Priest. And there is a contingency plan if the fill rate cannot be maintained at or below 0.15 feet per hour. Once again, these "commands" are both contingent upon observed conditions and, at times, contradictory. When read in context, these guidelines give the Corps ample discretion to respond to dynamic storm conditions in the way they conclude is best.

We note, once again, that for Appellants to prevail under prong two of the *Gaubert* test, they must show that the Corps was required to ignore numerous other policy considerations at play (navigation, water quality, power generation) in the face of an oncoming storm. Nothing in the applicable manuals requires focusing solely on the storm. The district court did not err by dismissing Appellants' claim related to its use of surcharge storage.

## D.

Appellants contend that the discretionary function exception does not bar their failure-to-warn claim. The district court did not address this claim when it dismissed this case. We nonetheless have jurisdiction to consider it because we conclude that the district court implicitly rejected it. *See Ford Motor Co. v. Transp. Indem. Co.*, 795 F.2d 538, 543 (6th Cir. 1986) (holding that although the district court failed to address specific counterclaims, the Court was persuaded that the district court implicitly rejected them).

Central to Appellants' failure-to-warn claim is their allegation that the district court should have permitted jurisdictional discovery related to possible mandatory Corps directives unavailable in the public realm, specifically Old Hickory's Emergency Action Plan ("EAP"). We review for abuse of discretion a claim that a case was dismissed prematurely because jurisdictional discovery should have been afforded. *See Theunissen v. Matthews*, 935 F.2d 1454, 1465 (6th Cir. 1991) ("[T]he scope of discovery is a matter committed to the district court's sound discretion, and district court rulings on discovery matters are subject to reversal only for abuse of that discretion.").

We have observed that the government is "generally shielded from tort liability" in deciding whether to warn of potential dangers. *Edwards v. Tenn. Valley Auth.*, 255 F.3d 318, 324 (6th Cir. 2001); *see also Reetz v. United States*, 224 F.3d 794, 797 (6th Cir. 2000). Specifically, it is the type of decision that "fit[s] within the second prong of the discretionary function test." *Bell v. United States*, Nos. 99-5563, 99-5655, 2000 WL 1720932, at *5 (6th Cir. Nov. 6, 2000). To the extent these opinions may be read to suggest that failure-to-warn claims categorically satisfy the discretionary function exception, *see, e.g.*, *Rosebush*, 119 F.3d at 443 ("[T]he decision whether to warn of potential danger is a protected discretionary function."), we decline to endorse that position. This Court must analyze each of Appellants' claims under the two-prong *Gaubert* test. *See Graves v. United States*, 872 F.2d 133, 137 (6th Cir. 1989) ("This analysis is basically ad hoc, and depends on the facts of each case."); *Reetz*, 224 F.3d at 796 ("[T]he court must conduct a two-part test.").

First, Appellants have cited no directives in the record before us that require the Corps to warn downstream residents. Thus, Appellants must show that the district court abused its discretion in granting the government's motion to dismiss prior to affording them discovery of Old Hickory's Emergency Action Plan ("EAP"). Appellants speculate that the EAP might contain mandatory directives related to certain procedures for issuing warnings because an EAP "specifies preplanned actions to be followed" and "contains procedures and information to assist the dam owner in issuing early warning and notification messages to responsible downstream emergency management authorities in the event of an emergency." Pl.s' Resp. in Opp. to Def.'s Motion to Dismiss 552 (citing Army Corps of Engineers, *Safety of Dams – Policy and Procedures*, Engineering Regulation 1110-2-1156, § 16.1 (Oct. 28, 2011)). But this provision

does not require these warnings to be broadcast *to the public*.   Furthermore, it only "recommend[s]" that the EAP include a "detailed communications plan" and "recommend[s]" including procedures related to the "[d]issemination of warnings by the Corps directly to the general public in the immediate vicinity of the dam and reservoir." *Id.* § 16.6.

Appellants cite to the Army Corps of Engineers *Flood Control Operations and Maintenance Policies*, which requires that "an Emergency Notification Procedure . . . shall be developed in writing to provide for safety of people in the vicinity of the dam . . . ." Engineering Regulation 1130-2-530, § 2-3 (Oct. 30, 1996).  Elsewhere, however, the obligation is couched in discretionary terms and depends on the conclusions of other federal agencies:

> In carrying out water control activities, Corps of Engineers personnel must recognize and observe the legal responsibility of the National Weather Service (NWS), National Oceanic and Atmospheric Administration (NOAA), for issuing weather forecasts and flood warnings, including river discharges and stages. River forecasts prepared by the Corps of Engineers in the execution of its responsibilities should not be released to the general public, unless the NWS is willing to make the release or agrees to such dissemination.  However, release to interested parties of factual information on current storms or river conditions and properly quoted NWS forecasts is permissible.  District offices are encouraged to provide assistance to communities and individuals regarding the impact of forecasted floods.  Typical advice would be to provide approximate water surface elevations at locations upstream and downstream of the NWS forecasting stream gages.  Announcement of anticipated changes in reservoir release rates as far in advance as possible to the general public is the responsibility of Corps of Engineers water control managers for projects under their jurisdiction.

33 C.F.R. § 222.5(f)(8).   Releases of information are "permissible" and such disclosure is "encouraged."  Thus, even if the EAP happened to contain information on how the Corps should promulgate warnings, other regulations only encourage or recommend their promulgation.  We cannot conclude that the district court abused its discretion.

Second, although the government has not suggested an actual policy basis for its failure to warn, the burden is not on the government to do so.  Once the first part of the *Gaubert* test has been met, there is a "strong presumption" that the second part is also satisfied.  *Gaubert*, 499 U.S. at 324.  And actual policy analysis need not have been conducted because the decision to warn or not to warn must only be "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Appellants have not shown how this decision is not susceptible to policy analysis, especially

given the necessary budgetary and effectiveness inquiries involved.  *See Graves*, 872 F.2d at 137 (noting that determination "about what type of warnings were [sic] effective and cost-justified" was a policy decision); *Reetz*, 224 F.3d at 797 (describing budgetary considerations as an example of policy analysis).  The district court did not abuse its discretion by closing discovery, and did not err by dismissing Appellants' failure-to-warn claim.

**E.**

Finally, Appellants' negligent abandonment claim is also barred by the discretionary function exception.  The district court did not explicitly address Appellants' claim that the Corps' Nashville District Water Manager negligently abandoned his post during the storm.  We have jurisdiction to review this claim because we conclude that it was implicitly denied.  *See Ford Motor Co.*, 795 F.2d at 543.

The Corps' Nashville District Water Manager left the Nashville District office at 11:00 p.m. on Saturday night despite the imminence of the second round of storms.  Appellants' Br. 16, 60.  Appellants argue that had the Water Manager been present, water releases could have been increased throughout the night.  Appellants allege that "during the Water Manager's absence, the NWS repeatedly tried to contact Corps officials about weather forecasts and discharge information" but "[t]hose calls went unanswered."  Appellants' Br. 60.

Appellants, however, do not contend that the Water Manager violated a mandatory directive by not remaining at his desk for two days and two nights.  They focus solely on whether the alleged abandonment was grounded in public policy, the second part of the *Gaubert* test.  *Ibid.*  In the absence of a regulation or directive requiring that the Water Manager remain at his post during the entire flood event, the Water Manager has discretion in that area, meaning that there is a "strong presumption" that the Water Manager's conduct meets the second part of the *Gaubert* test as well.  We have held that decisions concerning "the allocation of limited agency resources," *Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991), "time constraints and the availability of personnel with experience," *Totten v. United States*, 806 F.2d 698, 701 (6th Cir. 1986), and decisions relating to the amount of personnel to assign to a particular task, *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 446 (6th Cir. 2005), all are policy considerations that trigger the discretionary function exception.  Answering the question whether

the Water Manager should have remained in his office throughout the storm necessitates similar policy balancing. The Water Manager's conduct satisfies both prongs of the *Gaubert* test. The district court did not err by dismissing Appellants' negligent abandonment claim.

**III.**

For the foregoing reasons, we AFFIRM the district court's dismissal of Appellants' claims.