RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

AMERICAN RELIABLE INSURANCE COMPANY, et al.,
          *Plaintiffs-Appellants/Cross-Appellees*,

          *v.*

UNITED STATES OF AMERICA,
          *Defendant-Appellee/Cross-Appellant*.

⎤
⎟
⎟
⎬   Nos. 22-6014/23-5439
⎟
⎟
⎦

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
Nos. 19-cv-469; 19-cv-470; 19-cv-472; 19-cv-474; 19-cv-478—J. Ronnie Greer, District Judge.

Argued:  January 31, 2024

Decided and Filed:  June 28, 2024

Before:  BOGGS, GILMAN, and NALBANDIAN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Jonathan J. Tofilon, GROTEFELD HOFFMANN LLP, Geneva, Illinois, for Appellants/Cross-Appellees.  Jeffrey E. Sandberg, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee/Cross-Appellant.  **ON BRIEF:**  Jonathan J. Tofilon, GROTEFELD HOFFMANN LLP, Geneva, Illinois, Mark S. Grotefeld, GROTEFELD HOFFMANN LLP, Austin, Texas, Matthew J. Evans, Daniel C. Headrick, KAY GRIFFIN, PLLC, Knoxville, Tennessee, Stephen J. Zralek, SPENCER FANE BONE MCALLESTER, Nashville, Tennessee, Evan B. Stephenson, SPENCER FANE LLP, Denver, Colorado, for Appellants/Cross-Appellees.  Jeffrey E. Sandberg, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee/Cross-Appellant.

     BOGGS, J., delivered the opinion of the court in which GILMAN and NALBANDIAN, JJ., joined in different parts.  GILMAN, J. (pp. 25–28), delivered a separate opinion concurring in part and dissenting in part.  NALBANDIAN, J. (pp. 29–37), also delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

BOGGS, Circuit Judge.    This case arises from a 2016 catastrophic wildfire in the Great Smoky Mountains National Park in Eastern Tennessee that spread into the City of Gatlinburg and Sevier County, Tennessee, resulting in the destruction of over 2,500 structures and the death of 14 people.    Appellant insurance companies paid claims to policy holders and then filed claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), against the National Park Service (NPS), alleging negligence for failure to follow multiple mandatory fire-management protocols in three major respects and for the failure to issue mandatory warnings to the public.

The government filed a motion, under Rule 12(b)(1) of the Federal Rules of Civil Procedure, to dismiss for lack of subject-matter jurisdiction, on grounds that it was immune from suit under the discretionary-function exception to the FTCA.    28 U.S.C. § 2680(a). The district court granted the motion on all three claims relating to fire-management protocols, but denied the motion on claims relating to the duty to warn.    The insurance companies appealed, and the government cross-appealed.

### I.  Factual Background

2016 was a year of unusual drought in the Great Smoky Mountains National Park (the Park).    On Wednesday, the day before Thanksgiving, a small vegetation fire (the Fire)[1] was spotted coming from Chimney Tops Mountain, a double-peaked, exposed bedrock summit at an elevation of 4,724 feet, located approximately 5.5 miles south of Gatlinburg, Tennessee.    The Park's Fire Management Officer (FMO), Greg Salansky, after hiking a steep two-mile trail, located the Fire burning on the treacherously steep, nearly vertical northern peak known as Chimney Tops 2.    Given the dense vegetation and hazardous terrain, Salansky determined that

—————————

[1]The Fire was later determined to have been set intentionally by teenagers throwing lit matches into the woods.

the best course of action was an indirect strategy, permitting the Fire to burn inside a 410-acre containment "box" delineated by topographic and natural barriers.

Due to the holiday, Slansky had granted leave to most of the Park's fire staff. Salansky did not cancel any of those requests or staff extra resources, and he failed to utilize the Park's fire-management step-up (staffing) plan to request additional staffing needed to meet the elevated fire danger, based on the drought and weather forecasts. The Fire remained relatively small and inaccessible on Thursday and Friday and the firefighters who were not on leave spent time scouting the containment box. But by early Saturday morning, fire-weather forecasts indicated dangerous high winds on Monday and rain Monday night. Salansky performed a "Near Term Fire Behavior" projection in the field, which anticipated that the Fire could spread beyond the containment box. Nonetheless, Salansky believed, based on historical fire events and practices in the Park, that the containment box would successfully "catch and hold the fire."

On Sunday, Salansky arrived at the Park at 0730 hours and realized that the Fire "had become more active overnight." Salansky determined that the Fire had now risen to a Type 3 fire incident.[2] He now requested ground and aerial fire-suppression assets. At 1300 hours, a helicopter along with an air-attack plane arrived to, respectively, drop water and provide surveillance information on the Fire. At approximately 1500 hours, a second plane took the first infrared images of the wildfire for mapping purposes. Those images indicated that the Fire perimeter had grown and was near the edge of the southwestern line of the containment box. By 1630 hours, all aircraft were grounded for the day due to weather-related flight restrictions.

Sunday evening, at 2000 hours, Salansky went to an overlook northwest and below Chimney Tops 2. From this vantage point, he observed that the visible Fire behavior appeared minimal, stating "you couldn't even see the fire except for a couple glowing areas." Because "the fire appeared quiet" with "no continuous line of fire visible," Salansky lowered his classification of the Fire from a Type 3 to a Type 4 fire incident, even though the infrared aerial images had mapped the Fire at 35 acres in size on the southwest side of the mountain.

---

[2]Wildfires are typed by complexity, from Type 5 (least complex) to Type 1 (most complex).

Salansky sent all firefighters home for the evening and all monitoring of the Fire stopped throughout the night.

When firefighters returned at 0700 hours Monday morning, the Fire had spread significantly and was now an estimated 250–500 acres in size. A strong wind was blowing north toward Gatlinburg and scattered "spot fires" were now outside the containment box. Having had no contact from the Park, the Gatlinburg Fire Department (GFD) initiated contact with FMO Salansky at 0900 hours in response to seeing ash and smoke. Salansky returned GFD's call at 1058 hours and, despite having a mutual-aid agreement, Salansky told the captain of the GFD that the Park did not need help fighting the Fire and that the Fire was not a threat to the city.

At 1100 hours, Salansky heard Park dispatch report that the Fire had spread to a picnic pavilion housing the Park's science center, resource-management offices, and fire offices, located approximately 1.5 miles from the Gatlinburg city limits. High winds drove the Fire from ridge top to ridge top and there were reports of spot fires at least 5 miles away from the main Fire. The Fire, which was described by Salansky as "very intense and very extreme," jumped roads, trails, wet drainages, and wide creeks. With the Fire having breached containment, Park dispatch now asked the GFD for assistance and Salansky requested a Type 2 incident-management team and resources from the Tennessee Interagency Coordination Center (TICC), as well as assistance from the Tennessee Division of Forestry (TDF) and the Cherokee National Forest. At 1330 hours, Salansky sought additional aerial support, but after just one attempted flight, no air assets could fly due to extreme wind turbulence. Then the TICC offered, and Salansky accepted, a Type 1 incident-management team that could arrive by 1800 hours the next day, Tuesday.[3] Until that time and throughout the entire fire incident, from Wednesday until Tuesday, Salansky served as the fire-management officer, the incident-command officer, and the duty officer.

By 1800 hours, the Fire had entered Gatlinburg where it combined with other fires started by downed power lines and engulfed parts of the city, reportedly igniting an additional structure every 18 seconds. Gatlinburg officials attempted to evacuate the city. By midnight the Fire

---

[3]The previously ordered Type 2 incident-management team was 4–5 days out.

covered 16,000 acres. At 0200 hours on Tuesday, rain began to fall and slowed the spread of the Fire. But by that time, the Fire had burned more than 17,000 acres, destroyed property worth hundreds of millions of dollars, injured 191 people, and killed 3 people in Gatlinburg and 11 people in Sevier County. This case against the government arises from the Park's fire-management policies and the actions employed by the Park up until the Fire left the Park boundaries at 1600 hours Monday, November 28.

## II.  Procedural History

The Chimney Tops 2 Fire sparked lawsuits from many plaintiffs, including several leading to the recently decided appeal in *Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023).[4] Here, Plaintiffs sued the government for negligence under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), on grounds that the Park was negligent for failing to follow multiple mandated fire-management protocols and for failing to issue mandatory warnings to the public about the Fire as required by policies set forth in five agency documents. Additionally, the claims are supported by two after-action incident reports of the Fire, one issued by the NPS and the other by the City of Gatlinburg and Sevier County. *See* Chimney Tops 2 Fire Review: Individual Fire Review Report (NPS Report), and ABS Group After Action Review of the November 28, 2016, Firestorm (ABS Review).

The fire-management claims assert that the Park 1) failed to follow the incident-command structure required for every wildland fire; 2) failed to follow mandatory fire-monitoring protocols; and 3) failed to follow the Wildfire Decision Support System (WFDSS) required in developing and authorizing a fire-management response. The failure-to-warn claims allege that the Park did not "notify park neighbors of fire management activities that have the potential to impact them" and failed to warn local residents and officials "about the status of and imminent danger presented by" the Fire.

The government moved to dismiss for lack of subject-matter jurisdiction under the FTCA's discretionary-function exception, 28 U.S.C. § 2680(a), which shields the government

---

[4]*Abbott* did not address any of the fire-management claims raised here, but did address the duty-to-warn claims.

from suit in tort so long as there is no "federal statute, regulation, or policy" that "specifically prescribes a course of action for an employee to follow," and the "judgment is of the kind that the discretionary function was designed to shield," i.e., an action "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 322–23, 325 (1991) (internal quotation marks omitted). In November 2020, the district court granted the government's motion to dismiss for lack of subject-matter jurisdiction as to the fire-management claims, but denied dismissal of the failure-to-warn claims. Plaintiffs appealed and the government cross-appealed.

### III.  Standard of Review

The government asserted sovereign immunity based on the discretionary-function exception to the FTCA by filing a motion to dismiss for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  A Rule 12(b)(1) motion may attack jurisdiction either facially or factually.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  The government's challenge on this appeal is solely a facial one that challenges the sufficiency of the pleading itself.  In a facial challenge, the material allegations in the pleadings are accepted as true and must be construed in the light most favorable to the nonmoving party. *Ibid*.

We review de novo the district court's ruling on a Rule 12(b)(1) motion to dismiss.  *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009).  Under the FTCA, a plaintiff meets its initial burden of establishing subject-matter jurisdiction so long as the pleading does not clearly fall within any of the exceptions of 28 U.S.C. §2680, one of which is the discretionary-function exception.  *Carlyle v. U.S., Dep't of the Army*, 674 F.2d 554, 556 (6th Cir. 1982) (citing 28 U.S.C. § 2680).  Once the "plaintiff has successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680," the burden of proof shifts to "the government to prove the applicability of a specific provision of § 2680."  *Ibid*.

### A.  Federal Tort Claims Act

The FTCA allows lawsuits against the United States:

for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting

within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b); *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535 (1988). However, there are "exceptions to this broad waiver of sovereign immunity," *Berkovitz*, 486 U.S. at 535, including the "discretionary function" exception, *Gaubert*, 499 U.S. at 322 (quoting 28 U.S.C. § 2680(a)).

The discretionary-function exception applies to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). It "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals," and prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Berkovitz*, 486 U.S. at 536–37; *see also Gaubert*, 499 U.S. at 323.

A two-part test determines if the discretionary-function exception applies. *Gaubert*, 499 U.S. at 328–32. "The first part of the test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Gaubert*, 499 U.S. at 322–23). To make this determination, courts must ask, does the federal statute, regulation, or policy "under which the action was taken allow the actor discretion to *choose* from among alternative courses of action? More simply, is the actor authorized to make decisions, or is a specific action required in all cases?" *Myers v. United States*, 17 F.3d 890, 895 (6th Cir. 1994).

The first part of the test is satisfied if the conduct in question was not controlled by mandatory statutes or regulations and "involve[s] an element of judgment or choice, rather than follow[ing] a federal statute, regulation, or policy specifically prescribing a course of action and leaving the employee no rightful option but to adhere to the directive." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364–65 (6th Cir. 2014) (internal quotation marks omitted). If the governmental entity is governed by a regulation or has a mandatory policy, then "the

discretionary function exception does not apply because there was no element of judgment or choice in the complained of conduct." *Rosebush*, 119 F.3d at 441.

If a governmental action is found to be discretionary, the second part of the test is met if the use of discretion is "the kind that the discretionary function exception was designed to shield," meaning the use of discretion must be "susceptible to policy analysis." *A.O. Smith Corp.*, 744 F.3d at 365. "Thus, where there is room for policy judgment and decision, there is discretion of the sort protected by Section 2680(a)." *Rosebush*, 119 F.3d at 441. If the conduct in question satisfies the first part of the test, then there is a strong presumption that the second part is satisfied, but the conduct must satisfy both parts for the discretionary-function exception to apply. *A.O. Smith Corp.*, 744 F.3d at 364–65. The "test is conjunctive," *Abbott*, 78 F.4th at 900, because "the government is entitled to sovereign immunity only if the complained-of actions are *both* discretionary and of the type the exception was designed to protect," *Mynatt v. United States*, 45 F.4th 889, 896 (6th Cir. 2022). In short, "[i]f the actions are either non-discretionary or discretionary but unprotected, the government is not entitled to sovereign immunity." *Ibid.*

When analyzing the FTCA's discretionary-function exception and assessing whether the conduct at issue was meant to be grounded in judgment or choice, "the crucial first step is to determine exactly what conduct is at issue." *Rosebush*, 119 F.3d at 441. The conduct at issue here is 1) the Park's use of a specified command structure when responding to the Fire; 2) the Park's monitoring of the Fire; 3) the Park's use of the Wildfire Decision Support System (WDFSS) in developing and implementing a fire-management response plan for the Fire; and 4) the Park's actions in notifying and warning Park visitors, neighbors, and local agencies about the Fire. The district court held that all fire-management claims were subject to the discretionary-function exception, but that the duty-to warn claims were not protected by the discretionary-function exception. *Am. Reliable Ins. Co. v. United States*, 502 F. Supp. 3d 1266, 1275–84 (E.D. Tenn. 2020).

**B. Analysis**

Wildland fires are defined as "any non-structure fire that occurs in vegetation or natural fuels." Interagency Standards for Fire and Fire Aviation Operations, (2016) (Redbook). There are two types of wildland fires: unplanned ignitions (wildfires) and planned ignitions (prescribed fires). Our case involves an unplanned ignition or wildfire. The Interagency Redbook "states, references, or supplements policy and provides program direction" within and between federal agencies "for fire . . . program management." The Redbook is comprised of both "guiding principles and discrete policies." No agency can modify the Redbook, but each agency can issue separate "[s]upplemental agency-specific direction of a more restrictive nature."

The NPS agency-specific fire-management policy is found in the NPS Director's Order #18: Wildland Fire Management (2008) (DO-18), which sets forth "the basic principles and strategic guidelines governing the management of wildland fire," and the NPS, Reference Manual 18: Wildland Fire Management (2014) (RM-18), which "is a technical expression" of the management polices set forth in DO-18. RM-18 recognizes that the Interagency Redbook provides the "[p]rimary guidance for operations and safety" and that RM-18 "addresses operations and safety topics not included in that guide."

NPS policy requires that "[e]very area with burnable vegetation must have an approved Fire Management Plan," which is a strategic plan "to manage wildland fires based on the area's approved land management plan." RM-18 provides the standards and procedures for developing and updating park fire-management plans and, to that end, provides a detailed template for parks to use in creating those plans. The NPS, Great Smoky Mountains National Park: Fire Management Plan (2010) (GSM Plan), follows that template and "outlines those actions that will be taken" by the Park to meet its fire-management goals. The NPS Fire Monitoring Handbook (2003) (FMH) provides the NPS fire-monitoring standards for both wildfires and prescribed fires.

**1.  Incident Command and Command Structure**

The Redbook recognizes that fire, as "a critical natural process, will be integrated into land and resource management plans . . . across agency boundaries" and that "[t]he circumstances under which a fire occurs, the likely consequences on firefighter and public safety and welfare, the natural and cultural resources, and the values to be protected dictate the appropriate response to fire."  At the same time, while specific firefighting responses will vary by fire, the Redbook requires that all "[w]ildland fire management agencies *will use* common standards for all aspects of their fire management programs to facilitate effective collaboration among cooperating agencies."

Specifically, Chapter 11 of the Redbook requires use of the National Incident Management System (NIMS), which provides "a universal set of structures, procedures, and standards for agencies to respond to all types of emergencies," and further states that NIMS "*will be used*" to respond to wildland fires.  The Incident Command System (ICS) is the on-site management system used in NIMS.**5**  ICS is "a standardized emergency management system specifically designed to provide for an integrated organizational structure that reflects the complexity and demands of single or multiple incidents, without being hindered by jurisdictional boundaries."  ICS is "the combination of facilities, equipment, personnel, communications, and procedures operating within a common organizational structure to manage incidents."  The Redbook requires that "ICS *will be used* by the agencies to manage wildland fire operations."

In the ICS, an Incident Commander (IC) is responsible for assessing an incident, maintaining command and control of the incident-management organization, developing strategies and tactics, and ordering, deploying, and releasing resources.  The Redbook requires that "*[a]ll wildfires regardless of complexity, will have an Incident Commander (IC) . . . responsible to the Agency Administrator(s) for all incident activities.*" (emphasis added).  Further, when a fire becomes a Type 3 incident, an IC "*will not serve concurrently as a single resource boss or have any non-incident related responsibilities.*" (emphasis added).

---

**5**"The ICS organizational structure develops in a modular fashion based on the complexity of the incident. Wildfire complexity is determined by completing a Risk and Complexity Assessment."

The Redbook provides that NPS fire-management staff includes the fire-management officer (FMO) and a duty officer (DO). The FMO is responsible for leadership of the Park's fire-management program through the Fire Management Plan (FMP). A DO monitors specific fires for compliance with NPS safety policies, and keeps Park leadership, including information officers, informed of the current and expected situation. The Redbook prohibits duty officers from performing incident-command duties. "*DOs will not fill any ICS incident command functions connected to any incident.*" (emphasis added). The Redbook states that "[i]n the event that the DO is required to accept an incident assignment, the FMO will ensure that another authorized DO is in place prior to the departure of the outgoing DO."

The GSM Plan, in Table 6, likewise provides that the FMO "is responsible for determining the need for and assignment of the Fire Duty Officer," whose role is "to provide operational oversight during periods of increased incident activities." The Plan also specifically prohibits a DO from filling any ICS incident-command structure. "*The Fire Duty Officer shall not fill any ICS incident command function connected to any incident.*" (emphasis added). To recap, the Redbook and the GSM Plan mandate a command structure separating the duties of FMO, IC, and DO.

Both after-action incident reports, the NPS Report and the ABS Report, found that the Redbook and GSM Plan command policies and prohibitions were not followed during the Chimney Tops 2 Fire. One person, Salansky, served in all three capacities, FMO, DO, and IC, performing both incident-command functions and FMP operational-oversight duties until the Fire left the park boundaries Monday night. After the Fire, NPS assembled a team of fire experts to review the Chimney Tops 2 Fire. The NPS Report found that, "Per policy, as defined in the 2016 [Interagency Redbook], a duty officer will not fill any Incident Command System (ICS) functions connected to any incident. *On this incident, the park's FMO operated in three roles: as the duty officer, the incident commander, and the fire management officer—contrary to 2016 Redbook policies.*" (emphasis added).

The NPS Report attempted to look at facts surrounding the Fire without outcome bias by applying a "sensemaking" approach in reviewing the incident. Using such an approach, decisions are understood to be based on the conditions that exist at the moment when those decisions are

made. The NPS Report considered 10 conditions that existed during the Fire, ranging from where the Fire started to fire-weather forecasts. Condition 7, which looked at the multiple roles and collateral duties of the FMO, found that "[t]he FMO was also acting in the roles of IC and duty officer for the duration of the Chimney Tops 2 Fire, until the Type 1 incident management team assumed command on Tuesday, November 29." As a result, "*The FMO decided to function (and continued) as ICT4 and then ICT3 with no duty officer, and while maintaining FMO duties, which is counter to NPS and Redbook policy.*" (emphasis added). So, although Salansky made a "decision," it was not a discretionary one because it was contrary to the specific mandates of the GSM Plan and the Redbook.

The NPS Report found that the relevant facts leading up to and influencing Salansky's decision included 1) that many park employees had been granted vacation for the Thanksgiving holiday and Salansky did not feel the need to recall employees; 2) the Park "had a historical culture within its fire program of being reluctant to accept outside support"; 3) Salansky had only been in the FMO position for approximately 8 months and lacked experience at being an FMO; 4) Park leadership did not question Salansky having collateral duties; and 5) the regional supervisor of Salansky did not question the multiple roles being filled by him or provide oversight to ensure work/rest guidelines or other policies were followed.

In its Rule 12(b)(1) motion to dismiss, the government did not dispute that Salansky failed to designate a duty officer, and that a single employee, Salansky, served and functioned as the FMO, the DO, and the IC simultaneously from the time the Fire was first discovered until the Fire left the park on Monday, November 28. Appellee/Cross-Appellant Brief at 36–38. Rather, the government argued that Salansky in fact had the discretion to do what he did: serve and function simultaneously as FMO, DO, and IC. The district court agreed with the government, holding that discretion existed in all of the tactics, strategy, and structure used to fight any wildfire, and concluded that "[s]taff assignments, step-up plans, and dividing responsibilities among individuals in the command structure certainly fall within the category of deciding how to fight a fire efficiently with available resources" and are protected by the discretionary-function exception. *Am. Reliable Ins.*, 502 F. Supp. 3d at 1282. In so holding, the district court relied on language in the Redbook stating that it provides a "framework," not "absolute or immutable

rules," and that the rules "require judgment in application."  *Id.* at 1283.  However, this discretionary language is only used in the Redbook in the context of discussing the principles of fire suppression and developing a fire-suppression strategy.

But the Redbook requires that discretionary fire-suppression decisions be made *within* a certain incident-command system and structure.  Under the ICS, the separation of duties in command structure is absolute when a fire reaches a Type 3 level incident.  The IC is in charge of firefighting, while the DO or FMO provide operational oversight to evaluate the incident complexity, ensure the proper level of incident command, assure compliance with the park FMP, and keep agency administrators and information officers informed of the situation.  The Redbook specifically states that every fire, regardless of complexity, will have an IC, and that when the fire becomes a Type 3 incident (which this was), that an IC will not serve concurrently as a resource boss or have non-incident related responsibilities, both of which are duties of the FMO.  It similarly mandates that "DOs will not fill any ICS incident command functions connected to any incident."

Fire suppression is what firefighters do when fighting a fire, and fire-suppression decisions require judgment based on the fire being fought.  Firefighting is dangerous, fast moving, and requires great skill and fortitude.  Obviously, deciding how to fight a particular fire requires discretion by those doing the fighting: e.g., do we let the fire burn, do we try to contain the fire, what suppression techniques do we use, do we use aerial fire assets.  However, discretionary fire-suppression strategies, techniques, and decisions are distinct from the mandatory command structure that must be used when responding to a fire.  The Department of the Interior (DOI) and the Department of Agriculture, through the Interagency Redbook, made a policy decision to require the use of NIMS and ICS by every agency—the Bureau of Land Management, the NPS, the U.S. Fish and Wildlife Service, and the Forest Service—in managing and responding to wildland-fire operations.[6]

Helpful application of the two-part *Gaubert* test is found in *Mays v. TVA*, 699 F. Supp. 2d 991 (E.D. Tenn. 2010), which involved a 2008 coal-ash-containment dike failure and coal-ash

---

[6]NIMS and ICS are used in all federal and state emergency-management-response activities ranging from search-and-rescue to hazmat incidents to natural disasters.

spill at a Tennessee Valley Authority (TVA) electricity plant.  In analyzing whether the discretionary-function exception applied to tort claims arising from the TVA's operation, use, and maintenance of the coal-ash facilities, the *Mays* court held, in ruling against the TVA, that "it is not the ultimate result of the challenged conduct and whether that result violated a specific statute, regulation or policy, but whether there was a violation of a *specific, mandatory directive* in the conduct leading up to the ultimate result."  *Mays*, 699 F. Supp. 2d at 1011 (emphasis added).  When conducting a discretionary-function inquiry, the issue of whether the challenged conduct was negligent is irrelevant.  *Rosebush*, 119 F.3d at 442.  At oral argument, the government did not dispute this principle and reiterated that the question on appeal is not causation, but whether NPS "had specific marching orders" on how to proceed.

And it is the existence of these "specific marching orders" that distinguishes the command-structure claims here from fire-suppression cases where courts have held that the discretionary-function exception protects fire-suppression efforts of the government from FTCA waiver of sovereign immunity.  *See Knezovich v. United States*, 82 F.4th 931 (10th Cir. 2023), and *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1217 (10th Cir. 2016).  In *Hardscrabble*, the Tenth Circuit held that the United States Forest Service (Forest Service) had discretion in how to respond to a wildfire started by lightning in Colorado.  *Hardscrabble*, 840 F.3d at 1217.  The Forest Service had initiated a partial fire-suppression strategy with the twin goals of allowing the fire to burn on Forest Service land while preventing it from spreading to private property.  *Id*. at 1218.  The relevant land-use plan specified that naturally ignited wildland fire could be used to achieve ecological objectives in certain predetermined areas.  *Id*. at 1219.  In response to public concern that a wildfire might get out of control, a checklist was included for Forest Service employees to *consider* when fighting wildland fire.  *Ibid*.  The *Hardscrabble* court held that the checklist did not explicitly tell the Forest Service "to suppress the fire in a specific manner and within a specific period of time," and that "[t]he existence of some mandatory language [in the checklist] does not eliminate discretion when the broader goals sought to be achieved [fire suppression] necessarily involve an element of discretion."  *Id*. at 1222 (citing *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998)).

In its most recent fire-suppression case, *Knezovich, supra*, the Tenth Circuit held that the Forest Service's decision to delay a full-suppression response to a fire of human or unknown origin involved judgment and choice as "the broader goal to be achieved—fire management— necessarily involves an element of discretion." 82 F.4th at 941 (cleaned up). The fire manual in question did not "specify the precise manner" in which the Forest Service must respond to a fire, but instead

> [i]t lists some considerations—firefighter safety and public safety—alongside a prohibition on considering resource benefits. But it does not mandate a partial or full suppression response from the get-go—nor does it prohibit waiting the fire out until more information is available.

*Id.* at 939.

In contrast to these fire-suppression decisions, using the ICS and following chain of command is not a discretionary firefighting technique. Paramilitary organizations, like incident-response teams, emergency-service units, and fire departments, all follow a mandatory command structure and chain of command (e.g., sergeant, captain, chief). Here, the distinction between the duties of FMO, IC, and DO are part of the mandatory command structure that must be followed by federal agencies fighting wildland fires.

The *Gaubert* test does not look at the ultimate result of the challenged conduct, but at whether there was a violation of a specific, mandatory policy in the conduct leading up to the violation. Here, because the use of the ICS and incident-command structure was mandatory, we do not need to address the second part of the *Gaubert* test. However, even if the Park's use of the ICS was discretionary under part one of the test, Salansky's actions to *not* follow mandatory ICS command structure and to *not* appoint an IC for the Chimney Tops 2 Fire is not the type of action the discretionary-function exception is designed to protect.

Under part two of the *Gaubert* test, "once a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision." *Mays,* 699 F. Supp. 2d at 1019. The public-policy decision to use the ICS and a non-FMO incident commander in fighting wildfires was made by the DOI and set forth in NPS regulations. Once DOI and NPS "engaged in the analysis as to what type of

policies and procedures to implement, it would not constitute a discretionary decision to decide whether to follow or act pursuant to those policies and procedures." *Ibid.  See also Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir. 1989) (the discretionary-function exception protected choosing a policy of deforestation, but did not protect negligence in implementing that policy by failing to warn about dangerous conditions created by unstable trees).

A district court case, *State Department of Agriculture & Consumer Services v. United States*, arose from a prescribed fire that escaped and caused fire damage to timber on adjacent land.  2010 U.S. Dist. LEXIS 89200, 2010 WL 3469353 (N.D. Fla. Aug. 30, 2010).  The United States Forest Service (USFS) issued a post-incident review of the fire, finding that it had failed to create a sufficient burn plan.  The *Florida Department of Agriculture* court, noting that this was not a fire-suppression case, held that the discretionary-function exception did not apply because of this admission of insufficiency and that although the government "may have had discretion as to the analysis conducted within the Burn Plan, [it] had no judgment or choice whether to complete a Plan and then follow it once approved."  2010 U.S. Dist. LEXIS 89200 at *9–10. The court held that having an insufficient burn plan was a fire-management failure, not a fire-suppression failure.

The same distinction applies here.  And, despite arguments to the contrary, it makes no difference that *Florida Department of Agriculture* involved a prescribed fire instead of a wildfire.  The FMH and GSM Plan requirement to use the ICS and incident-command structure applies to all wildland fires, not just wildfires.  Whether the Fire resulted from a prescribed fire or a wildfire does not change the mandate that the Park use the ICS and incident-command structure to fight the Fire.  Salansky's failure to use the required incident-command structure is not the type of decision or conduct protected by the discretionary-function doctrine.  The DOI policy decision to require use of the ICS and incident-command structure in fighting all wildland fires did not leave Salansky with any choice to take an alternative course of action.  Salansky thus violated the mandatory incident-command system requirements, so the discretionary-function exception does not apply.

## 2.  Fire Monitoring

Fire monitoring is "a fundamental NPS management policy to be fulfilled,"[7] and the FMH outlines standardized monitoring methods, but also recognizes that the collection of data during fire-conditions monitoring, including the frequency of that monitoring, will depend on the fire-management strategy of each park.

Here, the GSM Plan adopts the FMH protocols for fire monitoring.  Section 5.1 of the GSM Plan requires that "[a]ll wildland fires and prescribed fires will be monitored" and "will include documenting the fire environment (weather, fuels, topography), fire behavior (manner and rate of spread, flame length, etc.), and fire effects (percent of fuels consumed, changes in plant and animal community composition and structure, etc.)." The FMH sets forth recommended standards for fire monitoring within the NPS.  But those recommended standards are mandatory for fire-observation level 2 monitoring.[8]

The Chimney Tops 2 Fire involves level 2 monitoring and therefore the FMH recommended standards are mandatory.  Level 2 monitoring (fire observation) includes two stages: 1) reconnaissance monitoring, which is the part of the initial assessment and overview of the fire, and 2) fire-conditions monitoring, which monitors the dynamic aspects of the fire.  The FMH provides procedures and techniques for the mandatory collection of data on fire-condition variables such as slope, elevation, dry-bulb temperature, wind speed and direction, rate of spread, and perimeter growth.  It also lists optional variables that can be monitored, such as flame depth, fire-severity mapping, and smoke-column direction.

For example, Table 2 in the FMH lists, among other things, the frequency with which certain smoke-monitoring variables must be measured.  For example, visibility should be measured at the fireline every 30 minutes, with threshold exposure of burn-crew members to areas of less than 100 feet viability not to exceed two hours.  Monitoring ground-wind speeds is to be done every 1 to 6 hours, depending upon threat to safety and proximity to roads, when wind is 1-3 mph in the day and 3–5 mph at night.

---

[7]Neither DO-18 nor RM-18 describe how monitoring is to be done.

[8]There are four fire-monitoring levels, with level 1 and 2 applying to wildland and prescribed fires.

The district court held that fire monitoring was a discretionary function because the FMH explicitly allows parks to pick an appropriate monitoring method that may not be listed, noting that not all situations are suitable for implementing FMH requirements. The government agrees, arguing that the Park had discretion in deciding which particular strategy or schedule to employ when monitoring the Fire. Appellee/Cross-Appellant's Principal and Response Brief at 34. We agree. There is no policy requiring around-the-clock monitoring, or anything precluding the FMO from considering staffing limitations over the holiday weekend or considering what past strategies had been successful in responding to other fires. Rather, the FMH expressly states that a park's fire-management staff "should"—and therefore has the discretion to—"select appropriate variables, establish frequencies for their collection, and document those standards." We note that if Salansky had implemented and followed the required step-up plan, holiday staffing would not have been limited. On Sunday evening, Salansky downgraded the Fire from a level 3 to a level 4 and sent firefighters home for the night. This was a discretionary fire-fighting decision.

Although in hindsight that decision can be questioned, Salansky had the discretion to decide how to deploy resources to fight the Fire. A fire is monitored so that the FMO, DO, and IC have the data necessary to make discretionary decisions on how to fight a fire. Although the FMH provides highly technical and specific steps to be taken as part of the fire-monitoring process, the actual decision on when and how to monitor the fire is discretionary, based on the unique circumstances of every fire. Fire monitoring is part of the fire-suppression decision-making process, and the discretionary-function exception applies.

Having found that the conduct at issue is discretionary under the first *Gaubert* step, there is a "strong presumption that the second part of this *Gaubert* Test is satisfied" as well. *A.O. Smith*, 774 F.3d at 365 (internal quotation marks omitted). Given that the reason behind the fire-monitoring policy is to enable firefighters to exercise discretion in how to fight a particular fire, the second part of the *Gaubert* test is also satisfied.

### 3.  Wildland Fire Decision Support System (WFDSS)

Under NIMS, an IC is required to use the Wildland Fire Decision Support System (WFDSS) for all fires "that escape initial attack, exceed initial response, or are being managed for multiple objectives."  All three of these situations existed here.  Parks are required to use WFDSS to guide and document decisions and the rationale for wildfire-management decisions. After the fire's size-up and planned strategy and tactics are determined by the IC, that information will be relayed to the FMO or DO who will initiate the WFDSS documentation process and will notify the Fire Management Committee (FMC), a permanent, non-incident-specific park committee.  The FMC shall review the WFDSS documents for recommendation to the park superintendent for approval, and it will be published in a decision-support document.

Here, it is undisputed that the Park failed to use the WFDSS system during the Fire.  The NPS Report found that there was not a clear understanding of the requirement to use WFDSS by Salansky or Park leadership, who did not understand the policy or program value of using WFDSS tools.  In fact, the deputy park superintendent, the chief ranger, and the park superintendent had not taken the fire-management leadership course, as required by the Redbook for all park superintendents, and the deputy mistakenly thought WFDSS needed to be used only in Type 1 incidents.  Park senior leadership deferred to the expertise of the FMO.  Yet because Salansky was filling several roles during the Fire, he spent nearly all his time developing and implementing the plan to suppress the fire and did not use the WFDSS.  Again, the NPS Report found that the experience level of the FMO and Park leadership was not sufficient to know and understand the NPS policies, requirements, and standards; and Park leadership did not understand the value of using WFDSS tools, had not taken fire-management-leadership training, and mistakenly thought WFDSS usage was only required in Type 1 incidents.

The NPS Report noted that the Park's failure to use the WFDSS was compounded by the decision of the Park to "not submit a severity packet [step-up plan] throughout the majority of the wildland fire season even with persistent drought conditions, until November 2016."  When a request was finally submitted, it failed to identify or request any additional resources or staffing for a duty-officer position and "simply asked for money to extend hours of the current staff." This request was improperly sent directly from the FMO to the regional office without any

involvement or approval of the GSM Park administration.  Additionally, the NPS Report stated that the Park failed to communicate and coordinate preparedness efforts with interagency partners, as required by the Park's FMP.

The district court dismissed the WFDSS claims, holding that although the GSM Plan does have mandatory provisions, the Park and its employees have discretion in determining the best tactics to respond to fire, which would include whether to use a decision-support system.  It held that this discretionary decision involves a balancing of considerations, including public safety, firefighter safety, and resource management, all of which implicate economic, social, and political concerns that the discretionary-function exception is designed to protect.  *See Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 159 (6th Cir. 2018); *A.O. Smith Corp.*, 774 F.3d at 370.  This is adequate to meet the second prong of the *Gaubert* test.  *See also A.O. Smith Corp.*, 774 F.3d at 365.

We agree with the district court. Use of WFDSS guides "the ongoing effectiveness and reevaluation of suppression strategies," when fighting a fire.  Unlike the ICS command structure, WFDSS involves decisions that directly related to firefighting strategies and tactics.  Although the use of WFDSS is mandatory, its purpose is largely to document the discretionary decisions and rationales for making those fire-suppression decisions while fighting fire, decisions that involve social and economic considerations that the discretionary-function exemption is designed to protect.  Plaintiffs-Appellants lack subject-matter jurisdiction to bring a WFDSS negligence claim against the government under the FTCA.

### 4.  Duty to Warn

The duty-to-warn claims arise from the Park's failure to warn the public, park visitors, park neighbors, local officials, and local agencies of imminent danger from the Fire.  After being sent home Sunday evening, firefighters returned at 0700 hours on Monday morning to discover that the fire had spread significantly overnight and scattered spot fires had jumped the containment box with a strong wind blowing north toward Gatlinburg.  At 0900 hours Monday, the Gatlinburg Fire Department (GFD) tried to reach FMO Salansky by phone in response to seeing and receiving reports of ash and smoke in the city.  Nearly two hours later, Salansky

returned the call to the GFD at 1058 hours and, despite having a mutual-aid agreement with the GFD, told the GFD captain that the Park did not need help fighting the Fire and that the Fire was not a threat to the city. But 45 minutes later, Park dispatch called the GFD asking for assistance. Salansky then met in person with the Gatlinburg City Manager, the GFD chief, the Pigeon Forge Fire Chief, and others to discuss the potential threat to Park neighbors.

At 1540 hours, the City of Gatlinburg and the Park issued a joint press release, identifying a spot fire that posed a threat to the Mynatt Park neighborhood, stating that the GFD was preparing to protect the neighborhood, and noting that Gatlinburg police were going door-to-door in that area requesting voluntary evacuations. The release warned of more Fire growth over the next eight hours with a potential for spot fires outside the main Fire area and announced that there would be a press briefing at 1600 hours. Shortly after the press briefing, high winds disrupted power in Gatlinburg and Sevier County, preventing further dissemination of any electronically published press releases. The next press release was not issued until Tuesday at 0610 hours.[9]

Plaintiffs-Appellants claim that the Park took no action to warn local officials or residents of the Fire or its potential danger until it was too late, despite having a mandatory obligation to do so. They are not claiming that the duty-to-warn requirements were performed incorrectly, but that they were not performed at all. Plaintiffs-Appellants/Cross-Appellees Reply Brief at 10–12. Under the GSM Plan, "[f]irefighter and public safety is the first priority in all fire management activities." Appellants' duty-to-warn claims arise from two provisions of the GSM Plan: 1) Section 3.3.2, which provides that "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them,"[10] and 2) Table 13 in Section 4.4.2(F), which addresses Park interaction with park

---

[9]More factual details of the Park's response to the Fire as related to the duty-to-warn claims are set forth in *Abbott*, 78 F.4th at 892–93.

[10]The Park is divided into two fire-management zones. The first is generally contiguous with part of the Park boundary and includes developed areas within the Park. The second is known as the natural zone, which constitutes approximately 83% of the Park. Each zone has identical duty-to-warn requirements, Section 3.3.1 and Section 3.3.2 respectively. Both sections apply here because the Fire spread through the entire Park. The district-court opinion and briefs on appeal refer only to Section 3.3.2, but the analysis is the same for both.

neighbors[11] and "outline[s] mitigation actions required to protect values at risk and to ensure the safety of park staff and visitors as well as the neighboring public."

Table 13 lists mitigation actions required to ensure public safety. This includes actions relating to the safety of "Park Neighbors," most importantly the requirement that the Park "[i]nform park neighbors of wildland fires." The district court held that while the GSM Plan "gave NPS employees discretion when monitoring fires, the same cannot be said for notifying others about fires." *Am. Reliable Ins.*, 502 F. Supp. 3d at 1279. It reasoned that "grouping notifying others about fires into the same category as managing the fire and taking initial actions towards a fire stretches the natural reading of the FMP. Instead, the [GSM Plan] is best read to contain some provisions that require mandatory conduct and other provisions that allow discretion." *Id.* at 1280. The district court also rejected the government's claim that even if the policies are mandatory, they are not specific enough to eliminate discretion. *See ibid.*

In evaluating the duty-to-warn claims, we must look to our recent published decision in *Abbott v. United States*, 78 F.4th 887 (6th Cir. 2023). In *Abbott*, where the district court dismissed the case for lack of subject-matter jurisdiction under the FTCA, there were two issues. The first, whether the plaintiffs sufficiently met the presentation requirement when submitting their claims to the Department of Interior, is not at issue in this case.[12] *Id.* at 899. The second, whether the failure-to-warn claims against the Park were barred by the FTCA's discretionary-function exception, is at issue here. *Id.* at 899–903. But the procedural history in *Abbott* is significantly different from the procedural posture of this case.

In *Abbott*, the government filed multiple motions to dismiss. The district court denied the first motion, holding that the discretionary-function exception did not apply because the GSM Plan contained mandatory directives related to the duty to warn, based on Section 3.3.2(C) and Table 13 of the GSM Plan. *Abbott*, 78 F.4th at 894–95. In its second motion, the government again moved to dismiss the claims, this time based on a factual challenge under the

---

[11]Table 13, which is titled "Mitigations for Public Safety Issues," is found in GSM Plan § 4.4, "Prevention, Mitigation and Education."

[12]*Abbott* held that plaintiffs did meet the presentation requirement and vacated the district court's order of dismissal on that basis. *Abbott*, 78 F.4th at 899.

discretionary-function exception, "essentially arguing that even accepting that the requirements of the FMP were mandatory directives, the Park complied with those requirements." *Id.* at 895. The district court found that the government had not presented evidence of compliance with those requirements and "rejected the argument that NPS had notified Park neighbors, Park visitors and local residents." It then denied the motion to dismiss. *Ibid.* The government filed a third motion that was also denied by the district court for reasons not relevant here. In its fourth motion to dismiss, the government moved to dismiss on the ground that the duty-to-warn claims had not been properly presented to the Department of the Interior. The district court granted this fourth motion, based solely on failure to properly present the claim. Plaintiffs appealed.

On appeal, the *Abbott* court held that the duty-to-warn claims had been properly presented and vacated the dismissal on those grounds. However, the government had also asked the court to affirm the district court's dismissal on the independent alternative basis that plaintiffs' duty-to-warn claims were barred by the FTCA's discretionary-function exception. *Id.* at 899. The *Abbott* court held that the district court erred "in determining that Section 3.3.2 was not discretionary solely because it does not include the exact 'if/then' language that the [c]ourt highlighted in *Myers.*" *Id.* at 901. Instead, *Abbott* held that the district court must go through a two-step process in analyzing the discretionary-function exception under Section 3.3.2. *Abbott* provides a detailed analysis of how that two-part test should apply to the duty-to-warn created by the GSM Plan.

*Abbott* held that although this statement does not have "if/then" language, it requires an "antecedent assessment" of whether the fire-management "activities have the potential to impact" park neighbors, visitors, and local residents. Thus, *Abbott* held that the district court must first determine if the Park ever made that required antecedent assessment. If the Park did not, it is not protected by the discretionary-function exception. *Id.* at 901. If the Park did conduct the mandatory assessment, then the Park is protected only if Park officials found that the Fire "did not have the potential to impact" neighbors, visitors, and residents. *Ibid.* In other words, Section 3.3.2 has two mandatory directives. Section 3.3.2 would be discretionary only if

the Park determined (whether rightly or wrongly) that the Fire did not have the potential to impact neighbors, visitors, and residents. *Id*. at 907–08 (Clay, J. concurring).[13]

In both *Abbott* and this case, the duty-to-warn claim is the same—that the Park failed to provide *any* notice. But *Abbott* involved a factual attack on subject-matter jurisdiction, and the government has said that it stands ready on remand to present additional evidence that it did provide notice. The *Abbott* court held that because determination of the discretionary-function exception is jurisdictional, the district court should allow the government to present new evidence on remand and then determine whether Section 3.3.2. and Table 13 are mandatory directives. If the directives are found to be mandatory, only then must the district court apply the second part of the *Gaubert* test. *Id.* at 903.

Our case differs from *Abbott* in that the underlying motion to dismiss was not based on a factual challenge. Instead, in its Rule 12(b)(1) motion to dismiss, the government made a facial challenge, not a factual challenge, thus accepting the facts as presented. And, as outlined above, since Plaintiffs-Appellants' failure-to-warn claims survive the government's facial challenge, we remand for the same analysis as set forth in *Abbott* for identical failure-to-warn claims.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order granting the government's motion to dismiss Plaintiffs-Appellants' incident-command claim. We **AFFIRM** the district court's dismissal of the fire-monitoring claim and the WFDSS claim as part of the discretionary fire-suppression decision-making process. We **AFFIRM** the district court's denial of the government's facial challenge to Plaintiffs-Appellants' duty-to-warn claims, and **REMAND** these claims for further proceedings consistent with this opinion.

---

[13]Table 13 duty-to warn requirements do not involve an antecedent assessment because the table lists specific mitigation actions that are required to ensure safety, including the duty to "inform park neighbors of wildland fires." *Abbott*, 78 F.4th at 902.

---

**CONCURRENCE / DISSENT**

---

RONALD LEE GILMAN, Circuit Judge, concurring in part and dissenting in part. I fully concur in the portions of the lead opinion regarding the Appellants' command-structure, fire-monitoring, and failure-to-warn claims. For the reasons set forth below, however, I see no meaningful distinction between the command-structure and the Wildland Fire Decision Support System (Support System) claims with regard to the discretionary-function analysis. I therefore respectfully dissent from the portion of the lead opinion that will prevent the Appellants from pursuing their Support System claim against the government.

The lead opinion concludes that the FTCA's discretionary-function exception does not apply to the command-structure claim because "discretionary fire-suppression decisions must be made *within* a certain incident-command system and structure," and that "discretionary fire-suppression strategies, techniques, and decisions are distinct from the mandatory command structure that must be used when responding to a fire." Lead Op. at 13 (emphasis in original). But such decisions must also be made within the parameters of the Support System, which is a "web-based decision support system" that, in addition to documenting decisions, "provides the decision framework for selecting the appropriate management response" to fires.

I fully agree with the lead opinion that there is a distinction between an "incident-command system and structure" and the discretionary decisions made within that system. Lead Op. at 13. By that same logic, however, there is an equivalent distinction between the mandatory use of the Support System and the discretionary decisions made within that "decision framework."

The lead opinion nevertheless concludes that the discretionary-function exception applies because the Support System "involves decisions that directly related to firefighting strategies and tactics." *Id.* at 20. But the command structure is equally focused on executing firefighting strategies and tactics, and yet the lead opinion correctly deems the use of the command-structure system *non*discretionary. I see the use of both systems as nondiscretionary, with both providing

a mandatory framework to guide the Park officials in effectively fighting fires. And even though the Support System leaves room for discretion in how it is used to guide the Park officials' firefighting decisions, this court has recognized that protocols that allow for discretionary judgments in "*how* and *when* they are to be implemented" can "nonetheless be nondiscretionary as to *whether* they are to be implemented." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 367 (6th Cir. 2014) (citing *Navarette v. United States*, 500 F.3d 914, 918 (9th Cir. 2007)) (emphasis in original).

I believe that this court's decision in *Abbott v. United States* 78 F.4th 887 (6th Cir. 2023), provides helpful guidance here. In *Abbott*, the court concluded that the language in the Park's Fire Management Plan stating that "Park neighbors, Park visitors and local residents will be notified of all planned and unplanned fire management activities that have the potential to impact them" required the Park officials to "make an 'antecedent assessment' before carrying out the required task." *Id.* at 900–01. The "antecedent assessment" in *Abbott* was to "determine if [the Park's fire-management activities] 'have the potential to impact [Park neighbors, visitors, and local residents].'" *Id.* at 901. "If Park officials failed to conduct that assessment, they are not shielded by the discretionary-function exception." *Id.*

Similarly, "if Park officials conducted the 'antecedent assessment' and determined that some fire management activities did indeed have the potential to impact Park neighbors, Park visitors, and local residents," then the Park officials had a mandatory obligation to warn those parties of those activities. *Id.* The Park officials were therefore "only shielded by the discretionary-function exception . . . if they conducted the required antecedent assessment and determined that the fire management activities did not have the potential to impact Park visitors, Park neighbors, or local residents." *Id.*

Just as warning Park neighbors, visitors, and local residents first required conducting an "antecedent assessment," so too does using the Support System. The lead opinion correctly points out that "an [Incident Commander] is required to use the [Support System] for all fires 'that escape initial attack, exceed initial response, or are being managed for multiple objectives.'" Lead Op. at 19 (quoting Redbook, § 11, ID# 2888). Therefore, before using the Support System, the Park officials must first conduct the "antecedent assessment" to determine

whether a fire "escape[d] initial attack, exceed[ed] initial response, or [was] being managed for multiple objectives." *Id.* If the Park officials believed, after conducting the antecedent assessment, that a fire had indeed escaped the initial attack, exceeded the initial response, or was being managed for multiple objectives, then they had a mandatory obligation pursuant to *Abbott* to "carry[] out the required task"—which was to use the Support System. *See id.* at 901.

Yet the Park officials failed to utilize the Support System despite their recognition that "[a]ll three of these situations existed here." Lead Op. at 19. As the lead opinion notes, this failure was apparently due to the lack of proper training. *See id.* I thus see no basis to expand the scope of the discretionary-function exception to shield such a failure.

Furthermore, even if the Support System were deemed sufficiently discretionary to satisfy the first prong of the *Gaubert* test, *see United States v. Gaubert*, 499 U.S. 315, 322–23 (1991), the Park officials' failure to use the Support System cannot satisfy the second prong. The lead opinion reaches the same conclusion with regard to the non-use of the command structure, stating that "Salansky's actions to *not* follow mandatory ICS command structure . . . is not the type of action [that] the discretionary-function exception is designed to protect." Lead Op. at 15 (emphasis in original). Following this approach, the Park officials' decision to disregard the mandatory Support System is similarly not protected by the discretionary-function exception.

And to the extent that any failure to use the Support System might not have caused Appellants' injuries because "[the Support System's] purpose is largely to document [the Park officials'] discretionary decisions and rationales," *see* Lead Op. at 20, the government itself "reiterated [at oral argument] that the question on appeal is not causation." *Id.* at 14; *see also Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) ("If . . . an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should 'find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.'") (quoting *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997)).

The government's reliance on *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216 (10th Cir. 2016), is therefore unpersuasive. Although the *Hardscrabble* court concluded that the United States Forest Service's failure "to conduct daily monitoring of the fire in the [Support System]" was shielded by the discretionary-function exception, that court did so because (1) the record indicated that the Forest Service had "released two Initial Decisions in [the Support System]" and had "monitor[ed] the fire sufficiently and in accordance with its discretion," and (2) the court was reviewing a grant of summary judgment. *Id.* at 1222.

In adjudicating a facial challenge to subject-matter jurisdiction under Rule 12(b)(1), however, we must "treat the allegations of the complaint as true." *L.C. v. United States*, 83 F.4th 534, 542 (6th Cir. 2023) (citation and internal quotation marks omitted). And here, the Appellants expressly alleged that (1) Fire Management Officer Greg Salansky "never utilized [the Support System] for decision support," and (2) this failure "substantially contributed to the inability to suppress and/or contain the . . . Fire before it left the Park, as appropriate ongoing assessments . . . would have demanded significant additional suppression resources to put out the . . . Fire." These allegations are supported by the record: the NPS Report specifically states that "the [Support System] was never utilized for decision support," and RM-18 notes that the Support System's record "provides the decision framework" and "aids managers by providing them with decision criteria to make the initial decision" about how to manage the fire. Similarly, the Redbook states that the Support System guides the Park officials in both (1) publishing an initial decision, and (2) using that initial decision to determine whether to conduct further analyses and publish subsequent decisions about that same fire. As a result, there is sufficient support in the factual record for the Appellants' allegations on this point.

For all of the reasons set forth above, I would reverse the dismissal of the Support System claims and remand those claims to the district court for further proceedings. I therefore respectfully dissent from Part III.B.3. of the lead opinion.

---

**CONCURRENCE / DISSENT**

---

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.  I agree with the majority that we should affirm the district court's holding on the WFDSS and fire-monitoring claims.  But I disagree that we should reverse and remand the command-structure claim.  Just like the other two fire-management claims, command structure falls within the FTCA's discretionary-function exception.  By holding otherwise, we fail to correctly apply governing law and risk a circuit split on an important issue.  So I respectfully concur in part and dissent in part.

**I.**

The Federal Tort Claims Act authorizes causes of action against government employees for damages, 28 U.S.C. § 1346(b), but not for any action "based upon the exercise or performance" of a "discretionary function," 28 U.S.C. § 2680(a).  By holding federal actors accountable for failing to follow mandatory directions, but not interfering with their exercise of discretion, the statute tracks an understanding of separation of powers with deep roots in our legal landscape.  *See Marbury v. Madison*, 5 U.S. 137, 166 (1803) (When "the executive possesses a constitutional or legal discretion," "their acts are only politically examinable," but "where a specific duty is assigned by law . . . the individual who considers himself injured[] has a right to resort to the laws of his country for a remedy.").  Courts have declined to impose tort liability for discretionary actions because that transgresses the bounds of judicial power.  *See Dalehite v. United States*, 346 U.S. 15, 34 (1953) ("It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law."); *see also id.* at 34 n.30 (collecting cases).  Indeed, before the FTCA and its discretionary-function exception, courts at common law "determined that they would only issue writs of mandamus against officers discharging ministerial, as opposed to discretionary, governmental tasks."  Harold J. Krent, *Preserving Discretion Without Sacrificing Deterrence: Federal Governmental Liability in Tort*, 38 UCLA L. Rev. 871, 876 n.22 (1991).

To maintain this balance, we have articulated an understanding of "discretion" that is "mandated by the language of the exception." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Conduct is "discretionary" if it involves "an element of judgment or choice." *A.O. Smith Corp. v. United States*, 774 F.3d 359, 364 (6th Cir. 2014); *L.C. v. United States*, 83 F.4th 534, 544 (6th Cir. 2023) (quoting same language). So if "there was room for judgment or choice in the decision made," *Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012), the FTCA does not allow us to question it. In fact, the text of § 2680(a) requires that we do not.

With this background in mind, I turn to our case.

**A.**

Let's start with the facts. The record shows that claims about command structure fit within the discretionary-function exception. Take the Redbook. The majority relies on the Redbook's directive that "DOs will not fill any ICS incident command functions connected to any incident." Maj. Op. at 11 (quoting Redbook, PageID 2753 (emphasis omitted)). But discretionary terms surround this mandatory language. The Redbook does not provide "absolute or immutable rules" but instead acknowledges that its directives will "require judgment in application." Redbook, PageID 2681, 2802.[1] The district court found that "the Redbook specifically gives discretion to the NPS when implementing it and states that judgment is required." *Am. Reliable Ins. Co. v. United States*, 502 F. Supp. 3d 1266, 1283 (E.D. Tenn. 2020).

The majority believes the Redbook cabins these discretionary instructions to the specific activity of fire suppression. *See* Maj. Op. at 13–14. But the discretionary language quoted above appears in Chapter 1 of the Redbook, entitled "Federal Wildfire Management Policy Overview."

---

[1]This mirrors the discretionary language found in other documents, such as the NPS Director's Order #18 (DO-18), which the majority acknowledges sets forth "the basic principles and strategic guidelines governing the management of wildland fire." DO-18, PageID 2178.

Redbook, PageID 2672.**²**  This chapter provides "a consistent set of considerations with which to evaluate decisions, plans, and actions in different situations," including having a "clearly defined, decisive, and obtainable objective," responding with "[s]peed and [f]ocus," undertaking strategic "positioning," maintaining "simplicity" to avoid confusion, and ensuring "safety."  *Id.* at PageID 2681–82.  So there's no reason to limit the discretionary language to talking *only* about fire suppression when it appears in an overarching "Overview" chapter.  *See Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998) ("The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion.").

Even if only fire-suppression duties come with discretion, command-structure decisions about personnel and role responsibilities certainly pertain to these discretionary goals of fire-suppression.  Just look at the Fire Management Plan (FMP) to see why.  The FMP tells us the "Fire Management Officer [i.e., Salansky] is responsible for determining the need for and assignment of the Fire Duty Officer."  FMP, PageID 2600.  The majority admits as much.  *See* Maj. Op. at 11.  But the majority believes the following sentence—the "Fire Duty Officer shall not fill any ICS incident command function connected to any incident," *id.*—removes Salansky's discretion.  But if the need for a Fire Duty Officer is a judgment call in the first place, then the mandatory language must be understood within its discretionary context.  Indeed, it "would be an odd corpus of law . . . that did not contain somewhere within it some provision that could be seen as a mandatory directive," but courts "must 'construe the nature of the statutory and regulatory regime as a whole,' not isolate an individual provision from its context."  *Blanco Ayala v. United States*, 982 F.3d 209, 216 (4th Cir. 2020) (quoting *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 859 (4th Cir. 2016)).  So even if there is some mandatory language on paper, it's hard to see how the command structure is anything but discretionary in practice.

Just compare the majority's envisioned course of action to reality to see why.  The majority believes the "DOI policy decision to require use of the ICS and incident-command

---

**²**And then Chapter 7, entitled "Safety and Risk Management," states that the "primary means by which we implement command decisions and maintain unity of action is through the use of common principles of operations," and the principles "are not absolute rules" but "require judgment in application."  Redbook, PageID 2802.

structure in fighting all wildland fires did not leave Salansky with any choice to take an alternative course of action." Maj. Op. at 16. Under this reading, as soon as Salansky came across the fire, he did not have "any choice" to respond at all until he appointed the requisite staff. After all, two of the contested positions—incident commander and duty officer—are specifically tied to fire suppression. The "Incident Commander (IC) is responsible for the overall management of the incident," and the "Duty Officer (DO) provides operational oversight for monitoring unit incident activities." NPS Report, PageID 3405. And the "Fire Management Officer (FMO) is responsible for the oversight of a fire program on a management unit." *Id.* So until Salansky appointed two other people to serve as IC and DO, Salansky could not engage in "overall management of the incident," nor could he oversee any "incident activities." Indeed, the moment he responded to the fire, he would have become the de facto IC. Thus, according to the majority, he couldn't respond at all.

But what if no one else was available? Could Salansky respond to the fire to serve the goals of "public health and safety" and "cost effectiveness?" FMP, PageID 2584, 2587–88, 2590. If he determined these goals were best met by responding immediately, was he still required to wait until someone else arrived? To get more people to fill the different roles, must Salansky call people back from vacation? Or was he required to bring in an outsider? What about the park's history of not accepting "outside support," which yielded "past successes"? NPS Report, PageID 3450. If he determined that he needed to break with this custom and bring in outside help, how long would it take to arrive? And wouldn't Salansky need to weigh the benefits of additional personnel against the cost of delay?

In reality, this is an area where Salansky had room for judgment or choice. *See Berkovitz*, 486 U.S. at 536; *Kohl*, 699 F.3d at 940. The majority admits that "[f]irefighting is dangerous, fast moving, and requires great skill and fortitude." Maj. Op. at 13. And "[o]bviously, deciding how to fight a particular fire requires discretion by those doing the fighting." *Id.* Yet, we are to believe that once Salansky came across the fire, his hands were tied

until he assigned different titles to different people.[3]  But common sense tells us why this wasn't the case.

**B.**

The majority also relies on reports prepared in the wake of the fire, claiming that the "NPS Report and the ABS Report[] found that the Redbook and GSM Plan command policies and prohibitions were not followed during the Chimney Tops 2 Fire."  Maj. Op. at 11.[4]  But the discretionary-function exception applies "whether or not the discretion" is "abused."  28 U.S.C. § 2680(a).  So our inquiry isn't about whether Salansky pursued the right action; it's about whether he had discretion in pursuing it.[5]

If the events recounted in the after-incident reports establish anything, they show the discretion inherent in command-structure decisions.  The NPS Report reads:

> Many of the park fire staff employees had been granted "annual leave" (vacation) for the Thanksgiving Holiday weekend, prior to the Chimney Tops 2 Fire starting and based on past park wildland fire history.  Based on the observed activity of this fire, the FMO/IC and park leadership did not feel an immediate need to cancel this annual leave status and recall employees.
>
> The park has a historical culture within its fire program of being reluctant to accept outside support.  This has been reinforced by past successes with this culture.  The FMO/IC believed that giving employees annual leave was the

---

[3]Contrast this with the majority's WFDSS analysis, in which the majority concludes: "Use of WFDSS guides 'the ongoing effectiveness and reevaluation of suppression strategies,' when fighting a fire.  Unlike the ICS command structure, WFDSS involves decisions that directly related to firefighting strategies and tactics."  Maj. Op. at 24.  And the WFDSS regulations contain similar pockets of mandatory language, just like the command structure. *See* RM-18, PageID 2215 ("Parks *will* use the [WFDSS] support process" (emphasis added)); FMP, PageID 2607 ("Extended attack action *requires* a structured decision process" like the WFDSS. (emphasis added)).  But that does not stop the majority from concluding that the overall endeavor is discretionary.  The same is true for command structure.

[4]I note that the report found that even though "the FMO was simultaneously serving as the duty officer and incident commander" "that would likely have not led to a different outcome on the Chimney Tops 2 Fire."  NPS Report, PageID 3454–56.

[5]And here, even if it were relevant, the NPS Report found that Salansky did not act negligently. *See* NPS Report, PageID 3460 ("Despite these weaknesses, the review team found no evidence of wanton disregard or negligence by anyone at the park.").  This is an odd conclusion to reach if Salansky disobeyed mandatory directives.  Typically, disobeying required regulations is negligent per se. *See Rimer v. Rockwell Int'l Corp.*, 641 F.2d 450, 455 (6th Cir. 1981) (finding that party was not negligent per se because there were "no regulations which specifically require[d]" the alleged response).

correct thing to do and did not have a sense of urgency from the Chimney Tops 2 Fire due to the low fire behavior. Thus, the FMO/IC believed the collateral duties scenario would be successful. Based on low wildland fire frequency/intensity /growth in the past, this practice had always worked before.

NPS Report, PageID 3450. This is riddled with judgment calls that Salansky needed to make in little time about personnel and fire management.

What's more, Salansky's supervisor apparently ratified his decision to serve in multiple roles. "Park leadership did not question the FMO/IC for having collateral duties." *Id.* "The supervisor of the FMO/IC did not question the multiple roles being filled by the FMO," and "the regional office did not question the multiple roles." *Id.* at PageID 3451. For regulations to be mandatory, the language must "leave[] the [government] with no choice but to adhere to the protocol." *A.O. Smith*, 774 F.3d at 368 (citing *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997)). But if Salansky had "no choice," why did his supervisors permit him to act in multiple roles? To the contrary, it's hard to see how this left Salansky with no "room for judgment or choice in the decision made." *Kohl*, 699 F.3d at 940.

## C.

Now consider how other courts have approached fire-management claims. Other circuits have aptly explained how the discretionary-function exception operates when there is some mandatory language nested within broader discretionary language: The "existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1222 (10th Cir. 2016) (quoting *Miller*, 163 F.3d at 595); *see also Holbrook v. United States*, 673 F.3d 341, 348 (4th Cir. 2012). So simply pointing to some mandatory language within the command structure doesn't end our inquiry.

The majority believes it can distinguish *Hardscrabble* because that dealt with a "checklist," which "did not explicitly tell the Forest Service 'to suppress the fire in a specific manner and within a specific period of time.'" Maj. Op. at 14 (quoting *Hardscrabble Ranch*, 840 F.3d at 1222). But *Hardscrabble*'s overall reasoning about the legal effect of mandatory and discretionary language is analogous to our case. The Tenth Circuit accepted that the checklist

was "mandatory," but it still held that "the Checklist itself conferred discretion on the USFS decisionmakers" because the "Checklist simply did not remove USFS employees' choice or judgment regarding what measures to take; it did not 'specifically prescribe a course of action for an employee to follow.'" *Hardscrabble Ranch*, 840 F.3d at 1220–21 (quoting *Berkovitz*, 486 U.S. at 536). Here too, the mandatory language around the command structure did not "remove . . . choice or judgment" from Salansky about personnel. And though the regulations told Salansky about dividing the different roles among different people, even this directive did not "prescribe a course of action for [him] to follow." The mandatory language does not tell Salansky if he should have called people off holiday leave or brought in outside help. So even accounting for mandatory directions, Salansky's response still required judgment calls, interest balancing, and discretion.

More recently in *Knezovich v. United States*, plaintiffs again pointed to mandatory language in pertinent regulations, but the court concluded that "the Manual as a whole contains competing considerations that bear on a wildfire response." 82 F.4th 931, 940 (10th Cir. 2023). So "[c]onsidered in context, the Forest Service Manual does not prevent the Service from making a judgment call in its initial response to a fire of human or unknown origin," because concluding "otherwise would strip the Forest Service of its ability to balance the safety, conditions, weather, and resource requirements that go into any fire response." *Id.* Again, the same considerations are true here. Despite the few lines of mandatory language, Salansky was not prevented "from making a judgment call in [his] initial response to [the] fire." *See id.* And the regulations "as a whole contain[] competing considerations that bear on a wildfire response." *See id.* These include "using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available" and "suppress[ing] the fire at the lowest cost with the fewest negative consequences with respect to firefighter and public safety." FMP, PageID 2590.

The takeaway from our sister circuits is that when discretionary language either prefaces or follows instances of mandatory language, overall fire-management activities remain discretionary. By concluding otherwise, we split from our sister circuits.

**II.**

Last, the majority says that "even if the Park's use of the ICS was discretionary under part one of the [*Gaubert*] test, Salansky's actions to *not* follow mandatory ICS command structure and to not appoint an IC for the Chimney Tops 2 Fire is not the type of action the discretionary-function exception is designed to protect." Maj. Op. at 15. So the majority believes the discretionary-function exception doesn't protect the command-structure claim even at the second *Gaubert* prong.

The second step in *Gaubert* asks "whether that judgment is of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (internal quotation marks omitted). This step prevents judicial second-guessing of "administrative decisions grounded in social, economic, and political policy" as long as the "governmental actions and decisions [were] based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. So the inquiry here focuses on whether the "nature of the actions taken" are "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Importantly, if a court finds that the conduct at issue is discretionary at the first *Gaubert* step, then there is a "strong presumption that the second part of this *Gaubert* test is satisfied" as well. *A.O. Smith*, 774 F.3d at 365 (internal quotation marks omitted).

Here, Salansky's personnel decisions are susceptible to policy considerations. Indeed, the FMP explicitly says that fire-management decisions "will reflect the goal of using available firefighting resources to manage the fire in the safest, most effective, and most efficient means available while meeting identified fire management unit goals and objectives," which include "suppress[ing] the fire at the lowest cost with the fewest negative consequences with respect to firefighter and public safety." FMP, PageID 2590. And Director's Order 18 explains that the "circumstances under which a fire occurs, and the likely consequences on firefighter and public safety and welfare, natural and cultural resources, and values to be protected, dictate the appropriate response to the fire." DO-18, PageID 2182. So "decisions regarding the allocation of fire suppression resources are grounded in public policy." *Miller*, 163 F.3d at 596. Calling in more people could drain resources away from other parts of the state, cancelling holiday leave comes with staffing costs, and waiting to appoint others to different roles rather than respond

right away could endanger lives.  These cost-benefit considerations are quintessential policy issues.  This satisfies the second prong of the *Gaubert* test.

## III.

Unlike the majority, I would affirm the district court on the command-structure claim.  So though I agree with the majority's analysis on the other fire-management claims, I must concur in part and dissent in part.